(83 Misc. Rep. 659)

## IN RE AFFLECK et al.

### (Surrogate's Court, Westchester County. January, 1914.)

1. WILLS (§ 682*)—CONSTRUCTION—TRUSTEES.
   In determining the persons entitled to a dividend on stock held in trust pursuant to a will, the testator's intention, when clear, must be carried out so far as it does not result in any unlawful accumulation of income.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1602, 1607–1611; Dec. Dig. § 682.*]

2. WILLS (§ 684*)—ORDINARY STOCK DIVIDENDS—TO WHOM PAYABLE.
   Ordinary dividends on stock held under a testamentary trust for a life tenant and remaindermen should be paid to the life beneficiary regardless of when the surplus out of which they are payable was accumulated.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1614–1628; Dec. Dig. § 684.*]

3. WILLS (§ 684*)—EXTRAORDINARY STOCK DIVIDENDS—TO WHOM PAYABLE.
   Extraordinary dividends on stock, held under a testamentary trust, when payable from the accumulated earnings of the company, either in cash or stock, belong to the life beneficiary, unless they intrench in whole or in part on the capital of the trust fund, in which case they should be returned to the trust fund, or apportioned between it and the life beneficiary, in accordance with the amount thereof accumulated before and after creation of the trust or purchase of the stock.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1614–1628; Dec. Dig. § 684.*]

4. WILLS (§ 684*)—STOCK DIVIDENDS—APPORTIONMENT—LIFE TENANTS AND REMAINDERMEN.
   The residue of an estate, including certain corporate stock, was bequeathed to testator's widow and a nephew, in trust to pay the income to her for life, with remainder to others, including such nephew. The corporation later apportioned its accumulated earnings and profits among its stockholders by an issue of additional stock. *Held*, that the stock increase paid to the trustees under the will should be treated as an extraordinary stock dividend, and apportioned between the life tenant and remaindermen so as to award to the remaindermen the earnings and profits accumulated prior to the creation of the trust, and to the life beneficiary or her successors the portion accumulated and earned subsequently.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1614–1628; Dec. Dig. § 684.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. APPEAL AND ERROR (§ 1195*)—LAW OF THE CASE—CONCLUSIVENESS OF JUDGMENT.

> A decree of the Appellate Division, on appeal from the decree of the surrogate, that the life tenant by signing certain vouchers was not estopped from claiming an extraordinary stock dividend was conclusive in a retrial, in proceedings on the judicial settlement of the accounts of the trustees, where there were no further facts shown.

> [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4661–4665; Dec. Dig. § 1195.*]

Accounting by Lizzie D. Affleck and another, as trustees under the will of James Affleck, deceased, and by James G. Affleck, as sole trustee under said will since the death of Lizzie D. Affleck. Decreed according to opinion.

See, also, 155 App. Div. 339, 140 N. Y. Supp. 345.

Michel Kirtland, of New York City, for trustee.
David F. Toumey, of New York City, for executor Barlow.

SAWYER, S. James Affleck died November 24, 1900, leaving a last will and testament, which was duly admitted to probate by the Surrogate's Court of Westchester county on February 9, 1901.

By the "Eighth" paragraph of said will a trust was created, as follows:

> "Eighth: After the satisfaction of the foregoing provisions of my will, I give, devise and bequeath all the rest, residue and remainder of my estate, both real and personal, to my executors, to lease or sell my real estate and to invest and keep invested the proceeds of such sales and also my personal estate, and to collect and pay the net rents, interest and income thereof, remaining after paying taxes, insurance and all other necessary and proper expenses, to my said wife during her life, and in case such net rents, interest and income shall not amount to the sum of six thousand dollars in any one year, then to pay my said wife in addition thereto so much of the principal of my estate as may be necessary to make up the deficiency; it being my wish and intention that my said wife shall not receive less than six thousand dollars per annum under this clause of my will for her support and maintenance; the amount so taken from the principal of my estate to make up such deficiency not to be returned by my executors to said principal."

After the death of his wife all the rest, residue, and remainder of his estate was devised and bequeathed by the testator, as follows:

> "Ninth: At and after the death of my wife I direct my executors to convert into personalty, as soon as practicable, all my estate not then so converted out of which I do give and bequeath the sum of five thousand dollars to my two nieces, Jennie and Mary, the daughters of my deceased sister Mary Burgess, that is to say: the sum of twenty-five hundred dollars to each, but in case said Jennie and Mary, or either of them, shall not then be living, the share the one so deceased would otherwise have received shall revert to and become a part of my residuary estate to be disposed of as hereinafter mentioned.

> "Tenth: I do give and bequeath after the death of my wife, the sum of two thousand dollars to each of the children of my brother David who may then be living.

> "Eleventh: I do give and bequeath to my brother-in-law, James A. Halley, after the death of my wife, the sum of five thousand dollars, but in the event of his death before the death of my wife, the said sum shall be paid to

his widow and in case his widow also shall be dead, then I give and bequeath the sum of twenty-five hundred dollars to his daughter.

"Twelfth: I do give and bequeath, after the death of my wife, to the Young Men's Christian Association of the city of Yonkers, the sum of one thousand dollars.

"Thirteenth: I do give and bequeath, after the death of my wife, to the Homeopathic and Maternity Hospital of the city of Yonkers, the sum of one thousand dollars.

"Fourteenth: All the rest, residue and remainder of my estate and property, remaining after the death of my wife and after satisfying the foregoing provisions of this my will, I direct my executors to divide into six (6) equal parts, which I do give and bequeath to the following persons, that is to say:

"To my nephew, William R. Affleck, if he shall then be living, one of such sixth parts, and if the said William R. Affleck shall not then be living, the same shall go to his lawful issue who may then be living in equal shares.

"To my executor, hereinafter named, one of such sixth parts, in trust, to invest the same and keep the same invested during the life of Mary S. Affleck, wife of my said nephew, William R. Affleck, and to pay the interest and income therefrom to the said Mary S. Affleck, during her life, and after her death I give and bequeath said sixth part to the lawful issue of my said nephew, William R. Affleck, who may then be living, in equal shares.

"To my nephew, James G. Affleck, if he shall then be living, two of such sixth parts, and if the said James G. Affleck shall not then be living, the same to be divided among his lawful issue in equal shares.

"To my nephew, Frank B. Affleck, if he shall then be living, one of such sixth parts, and if the said Frank B. Affleck shall not then be living, the same to go to his lawful issue, in equal shares, and in case of the death of the said Frank B. Affleck before the death of my wife, without leaving lawful issue, the said sixth part shall be divided between the children of my nephews, William R. Affleck and James G. Affleck, per capita and not per stirpes.

"The remaining sixth part I do give and bequeath to my brother William Affleck, if he shall then be living, and in case of his death before the death of my wife, then I give and bequeath the remaining sixth part to Emma M. Affleck, the widow of my said brother William Affleck, and in case of her death before the death of my wife, then said remaining sixth part shall be paid to the lawful issue of my brother William Affleck, then living, in equal shares.

"Fifteenth: I do hereby authorize and empower my executors, or such one or more of them as may qualify, and undertake the execution of this my will and the survivor, to sell any and all real estate whereof I may die seised, at any time and from time to time and in such manner and at such prices as they may deem proper and give necessary deeds to carry such sales into effect, except, however, that no sale shall be made during the life of my wife of the premises the use of which I have devised to my wife without her consent.

"My executors may, in their discretion, change or retain the investments in which my personal estate may, at the time of my death, be invested, and I leave it discretionary with them in what securities the estate which may come to them may from time to time be invested, except that any promissory notes held by me at the time of my death payable on demand shall not be called in during the life of my wife, provided the interest on such notes is regularly paid, but the amount of any such promissory note or notes made by any person named as a legatee in this my will shall be deducted from the amount herein bequeathed to the makers of said notes respectively.

"My executors are authorized to invest any funds belonging to my estate in such securities as ordinarily prudent men would purchase for investment of their own funds.

"If any securities should come to my executors or should afterwards be purchased by them which commanded a premium but which will depreciate in value as they approach maturity, my executors are authorized and directed to apply the whole income derived from such securities, in the manner in which the income of my estate is to be applied, without deducting

therefrom any portion of such income to provide against such depreciation in value.

"Sixteenth: I will and direct and declare that the provisions which I have made in this my will for my wife shall be accepted by her in lieu and bar of dower and all other interest in my estate.

"Lastly: I do hereby appoint my wife, Lizzie D. Affleck, and my nephew, James G. Affleck, executors and trustees of this my last will and testament and in case of the death of both my said executors and trustees, I do hereby appoint the Knickerbocker Trust Company of New York City to be executor and trustee in their place and stead, and my executors and trustees shall not be required to give any security for the faithful performance of their duties.

"All the powers and trusts hereby conferred on my executors and trustees, herein named, may be exercised by them or such of them as qualify and assume the trusts and by the survivor of them."

The death of Frank B. Affleck, unmarried, vests his interest in the remainder of the estate in his brother, William R. Affleck, as administrator.

The wife of the testator died on February 25, 1908, leaving a last will and testament, which was duly admitted to probate by the Surrogate's Court of Westchester county. Her nephew, E. Dudley Barlow, was appointed as executor of her estate, and is the objectant in this proceeding.

James G. Affleck, the surviving trustee, on or about April 14, 1908, commenced this proceeding for the judicial settlement of his account.

A portion of the estate of the testator consisted of 150 shares of the capital stock of the Pullman Company. The capitalization of the Pullman Company at the time of the death of the testator was $74,-000,000. At a meeting of the directors of the Pullman Company, held at Chicago on the 14th day of November, 1906, the following resolutions were adopted:

"Resolved, that the president be requested to present to the stockholders at their annual meeting to be held this afternoon, the following statement, namely:

"The directors desire to call the attention of the stockholders to the annual statement for the fiscal year, ending July 31, 1906, which shows that after writing off various amounts for depreciation, the value of the assets was $27,122,020.57 in excess of the par value of the capital stock of the company. This excess has not been diminished since the date of that statement.

"The directors are of opinion that, in view of the prevailing conditions, and the exigencies of the company's business, a distribution of any part of its assets would not be for the interest of the company or its stockholders.

"The growth of the business of the company has rendered necessary a very large increase of its equipment, and notwithstanding the construction of new cars constantly going on to replace old and worn-out cars, as well as to meet the added demands of increasing travel, there is now a necessity for additional equipment calling for a very large expenditure, and employing all the company's existing capacity for sleeping car building for the construction of such equipment.

"The manufacturing business of the company developed during the last year to a higher degree than it ever before attained, and it gives satisfactory evidence of further development in the near future. This development requires and will continue to require increased facilities and improved and enlarged instrumentalities of construction. The unprecedented demand for cars has demonstrated the necessity of improving and enlarging the company's manufacturing plant to enable it to be in a position to obtain its share of the business which such demand will create.

"The tendency, of greater or less extent, toward the substitution of steel for wood in the construction of the whole or a part of cars, particularly of freight cars, has determined your board to direct the construction for the manufacture of such cars or parts of cars, of a plant of the most improved, and therefore necessarily of a somewhat expensive character.

"The stockholders of the company are entitled to the immediate benefit of the investments and improvements thus made and contemplated to be made. The directors therefore recommend, to the end that the capital stock may bear a just and proper relation to the actual assets of the company, that the surplus assets to the extent of twenty-six million dollars ($26,000,000) be capitalized, and that for such purpose the capital stock of the company be increased to one hundred million dollars ($100,000,000) by the issue of additional stock to the amount of twenty-six million dollars ($26,000,000); and that said additional stock, with a necessary additional amount from the stock held in the treasury of the company, be distributed pro rata to stockholders of the company in the ratio of thirty-six (36) shares to each one hundred (100) shares held by stockholders of record at the close of business on the 30th day of November, A. D. 1906."

"Whereas, the value of the assets of this company exceeds the par value of the capital stock by more than twenty-six million dollars ($26,000,000): Resolved, that for the purpose of representing in the capitalization of this company existing surplus assets to the extent of twenty-six million dollars ($26,-000,000), the capital stock of the company is hereby increased to one hundred million dollars ($100,000,000); and the proper officers of the company are hereby directed to issue additional stock to the amount of twenty-six million dollars ($26,000,000), and resolved, that the directors be authorized to distribute said twenty-six million dollars ($26,000,000) capital stock with a necessary additional amount from the stock held in the treasury of the company, pro rata, to stockholders of the company in the ratio of thirty-six (36) shares to each one hundred (100) shares held by stockholders of record at the close of business on the 30th day of November, A. D. 1906."

"Whereas, the capital stock of this company has been increased by twenty-six million ($26,000,000) dollars; and whereas, certain stock of the company is held in the treasury from which properly a distribution may be made to the stockholders of the company: Resolved, that said increase of twenty-six million dollars ($26,000,000) capital stock, with the necessary additional amount from the stock held in the treasury of the company, be distributed pro rata to the stockholders of the company in the ratio of thirty-six (36) shares to each one hundred (100) shares held by the stockholders of record at the close of business on the 30th day of November, A. D. 1906, and the proper officers of the company are hereby directed to carry this resolution into effect."

Pursuant to said resolutions 54 shares of stock were allotted to the trustee in this proceeding. The question arises as to who is entitled to these 54 shares of stock as between the life beneficiary under the trust and the remaindermen.

It seems to me that nearly all, if not all, of the stock increase may be treated as a stock dividend. It was issued out of the existing surplus assets of the corporation pursuant to the resolutions of the company as above set forth. The testimony shows very clearly that nearly all of the surplus arose from the carrying out of the business of the corporation, and constituted a part of the profits earned by the company after the payment of the current charges, maintenance, operation, and regular cash dividend. In other words, it was the accumulated earnings and profits of the company.

In Cook on Corporations (6th Ed., chapter 33, § 552) it is said:

"Where shares of stock are held by an estate, and the income of the estate is to go to a life tenant for life, and the remainder to another party, the

question of whether the life tenant or the remainderman is entitled to a stock dividend or extraordinary cash dividend is a perplexing one. The stock dividend or extraordinary cash dividend may represent profits which were earned or accumulated before the life tenancy began. In that case it is clear that in justice the remainderman should receive it. If, however, it was earned after the life tenancy began, it is clear that the life tenant should have it. If it was earned partly before and partly after the life tenancy began, then it is apparent that in justice some apportionment should be made, if possible."

The troublesome question herewith presented has been considered by the courts in this and other states and countries in many and various forms from time to time since the decisions and opinions of the courts have been published. It has been said that no question before the courts has been more troublesome. Certainly none has resulted in greater contrariety of views. Decisions that are apparently contradictory either in the same court or in the courts of different states and countries have, however, been caused in part by different facts and circumstances existing in the cases decided and the effect necessarily given to the language of the will or instrument creating the trust in the particular cases in which the decisions have been rendered.

[1-3] In determining who is entitled to a dividend upon stock held in trust the intention of the testator or the maker of the trust must be carried out when such intention is clear, so far as such intent does not result in an unlawful accumulation of income. Very many cases arise, however, where the testator or maker of the trust had not considered the possibility of enormous dividends being declared by corporations to effectuate their reorganization, or in the division of accumulated profits made necessary by new statutes, changed circumstances, and modern rules and conditions, or, if such testator or maker of the trust had considered such possibility, he failed to express himself in the instrument creating the trust so as to show any clear intention regarding the same. See Matter of Osborne, 209 N. Y. 450, 103 N. E. 723, 823.

There seems to be, however, no doubt now as to the law in this state. The recent case in Matter of Osborne, supra, has fixed the rule in cases similar to the one under consideration. Judge Chase in writing the opinion in the Osborne Case lays down the following rule:

"It is manifest that any apportionment of a dividend is more or less troublesome in the practical handling of trust estates. It may be necessary in many cases to make the apportionment of dividends in an accounting by the trustee where all the parties interested are bound thereby. The dividends usually declared by corporations are the ordinary dividends such as are declared from year to year or other regular dividend periods. Extraordinary dividends are the exception. In all cases of ordinary dividends the courts uniformly hold that they should be paid to the life beneficiary of the trust in conformity with the general rule that dividends are deemed to have been earned as of the date of their declaration. In cases of extraordinary and unusual dividends, declared in whole or in part from earnings actually accumulated prior to the creation of the trust or the purchase of the stock, an adherence to the rule that dividends are deemed to have been earned as of the date of their declaration in many cases shocks the sense of justice.

"Notwithstanding the difficulty in many cases of apportioning dividends, it is wiser and better to leave an apportionment to courts of equity, in preference to adhering to a rule that depends more upon its simplicity and con-

venience of enforcement than upon justice and right. The distinction between ordinary and extraordinary dividends is necessary to make a workable rule and at the same time preserve the integrity of the trust fund. The integrity of the trust fund and rights of the life beneficiary under the trust should each be considered, determined, and preserved by a court of equity. As far as the courts in this state have made statements to the contrary, it has been in opinions where such statements have been unnecessary to the determination of the case then under consideration, and such statements are disapproved. It should be held: (1) Ordinary dividends, regardless of the time when the surplus out of which they are payable was accumulated, should be paid to the life beneficiary of the trust. (2) Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they intrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary"—

in accordance with the amount thereof accumulated before and after the creation of the trust or purchase of the stock.

[4] The dividend in this case is an extraordinary one composed wholly of stock, and should be apportioned between the life beneficiary and the remaindermen.

The portion of the earnings and profits accumulated prior to the creation of the trust should be awarded to the remaindermen, and the portion thereof which was accumulated and earned subsequently to the creation of the trust should be awarded to the life beneficiary or her successors in interest.

There is nothing in this case to show the source of the issue of the $640,000 worth of treasury stock, and there is nothing to show whether or not the same was issued from the surplus earnings and profits of the Pullman Company. This being so, I am of the opinion, therefore, that the issue of said treasury stock should not be included in the distribution of the stock apportionable to the life tenant. The result would be that $^{640,000}/_{26,000,000}$ of the 54 shares distributed or allotted should be deducted from the amount of the distribution to the said trustee, predicated upon surplus earnings and profits. The testimony shows that there were upward of $20,000,000 of earnings and profits accumulated subsequently to the death of the testator, and that about $6,000,000 of the earnings and profits were accumulated prior to the creation of the trust. The figures given above are only approximate and same may be corrected and adjusted upon the settlement of the findings and decree.

The method of apportioning the extraordinary stock dividend is explained in a motion made for that purpose in Matter of Osborne, 209 N. Y. 485, 103 N. E. 823, and is as follows:

"The intrinsic value of the trust investment is to be ascertained by dividing the capital and the surplus of the corporation existing at the time of the creation of the trust by the number of shares of the corporation then outstanding, which gives the value of each share, and that amount must be multiplied by the number of shares held in the trust. The value of the investment represented by the original shares after the dividend has been made is ascertained by exactly the same method. The difference between the two shows the impairment of the corpus of the trust. If the dividend is of money, the amount of that difference is to be retained by the trustee as capital, and

the remainder paid to the life beneficiary. If the dividend is in stock the amount of impairment in money must be divided by the intrinsic value of a share of the new stock, and the quotient gives the number of shares to be retained to make the impairment good—the remaining shares going to the life beneficiary. Market value, good will, and like considerations cannot be considered in apportioning a dividend."

[5] The attorney for the accounting trustee urges rather strenuously that the life tenant by signing certain vouchers has estopped herself or her representatives from claiming any portion of the 54 shares of stock in question. The vouchers referred to and the question of estoppel in this case were before the Appellate Division in Matter of Affleck, 155 App. Div. 339, 140 N. Y. Supp. 345, an appeal having been taken from the decree of the former surrogate. That court held that the introduction in evidence of the vouchers signed by Mrs. Affleck did not estop her representatives from claiming the stock in question. As there is nothing further before the court upon the retrial of this case, I must be controlled by the decision of the Appellate Division. I, therefore, decide that the vouchers signed by Mrs. Affleck do not estop her representatives from claiming the 54 shares of stock in question. Submit findings and decree on notice.

Decreed accordingly.